**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | | |
|---|---|---|
| In re: Ford's Colony Country Club, Inc., | ) | Case Number 10-50633 |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| | ) | |
| _____ | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF**
**REORGANIZATION FILED BY PRUDENTIAL INDUSTRIAL PROPERTIES, LLC**
**AND THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**[Filed only in Case Number 10-50633**
**Not filed in Case Number 10-50632 for Marsh Hawk Golf Club, LLC]**

**March __, 2011**

LeClair Ryan
Bruce H. Matson (Va. Bar No. 22874)
Christian K. Vogel (Va. Bar No. 75537)
Riverfront Plaza, East Tower
951 East Byrd Street, Eighth Floor
Richmond, Virginia 23219
(804) 916 7198 Direct
Christian.Vogel@leclairryan.com

Alston & Bird, LLP
Grant T. Stein (*pro hac vice*)
Jonathan T. Edwards
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
grant.stein@alston.com
jonathan.edwards@alston.com

*Attorneys for Prudential Industrial Properties,*
*LLC*

Wilson & McIntyre, PLLC.
John D. McIntyre (Va. Bar No. 35925)
500 E. Main Street, Suite 920
Norfolk, Virginia 23510-3889
P: (757) 961-3900
F: (757) 961-3966
jmcintyre@wmlawgroup.com

*Attorneys for the Official Committee of*
*Unsecured Creditors*

Prudential Industrial Properties, LLC ("Prudential") and the Official Committee of Unsecured Creditors (the "Committee," and together with Prudential, collectively, the "Proponents") submit this Disclosure Statement to describe the Plan (as hereinafter defined) filed by the Proponents in the Chapter 11 bankruptcy case (the "Bankruptcy Case") of Ford's Colony Country Club, Inc. (the "Debtor" or "Ford's Colony"). Ford's Colony, together with Marsh Hawk Golf Club, LLC ("Marsh Hawk") are sometimes referred to collectively as the "Debtors." The Proponents intend to consummate the Plan and to cause the Effective Date to occur promptly after confirmation of the Plan.

The Proponents recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan in accordance with the voting instructions set forth in this Disclosure Statement. To vote on the Plan, your Ballot must be duly completed, executed, and actually received no later than the Voting Deadline. Holders of Claims and Equity Interests entitled to vote on the Plan should read and carefully consider this Disclosure Statement, the Plan, and the exhibits thereto in their entirety.

The Disclosure Statement contains summaries of certain provisions of the Plan, statutory provisions, documents related to the Plan, and events in the Bankruptcy Case. Although the Proponents believe that the Plan and related documents are fair and accurate, the summaries in this Disclosure Statement are qualified to the extent that they do not set forth the entire text of such documents or statutory provisions. Factual information contained in the Disclosure Statement either has been uncovered in the course of the Bankruptcy Case or otherwise is contained in documents related to the Debtor filed with the Bankruptcy Court. Although the Proponents have used their best efforts to insure the accuracy of the information contained herein, they do not warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy or omission. If the terms of this Disclosure Statement and the Plan are inconsistent, the Plan will control.

Except as set forth in this Disclosure Statement, no person has been authorized by the Proponents in connection with the Plan or the solicitation to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits annexed hereto or incorporated by reference or referred to herein. Accordingly, you should not rely on any such information as having been authorized by the Proponents.

The statements contained in this Disclosure Statement are made as of the date hereof (unless otherwise indicated) and should not under any circumstance create any implication that the information contained herein is correct at any time subsequent to the date hereof. Any estimates of Claims and Equity Interests set forth in this Disclosure Statement may vary from the amounts of Claims and Equity Interests ultimately Allowed by the Bankruptcy Court.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances of the Plan. As to any judicial proceedings in any court, including any adversary proceedings or contested matters that may be filed in the Bankruptcy Court, this information is not to be construed as an admission or stipulation.

**IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND OTHER MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

# **TABLE OF CONTENTS**

# ARTICLE I.   INTRODUCTION

The Proponents are providing this disclosure statement (the "**Disclosure Statement**") to describe the Ford's Colony Plan of Reorganization (the "**Ford's Colony Plan**" or "**Plan**").  Only Creditors of Ford's Colony can vote on the Ford's Colony Plan.  A copy of the Ford's Colony Plan is attached to this Disclosure Statement as Exhibit A.  Terms herein with an initial capital letter not required by standard capitalization rules are defined terms, and each term used but not parenthetically or otherwise defined in this Disclosure Statement shall have the meanings given to them in the Plan.

**(A)     Plan Summary**

**The Ford's Colony Plan is structured to ensure a smooth transition to a financially strong and capable owner of the golf courses and country club operations.  _Current members of the country club will be invited to continue as members of the new club to be owned and operated by Prudential and resigned members will be invited to return to the club_.  Payments will also be set aside for unsecured creditors in both bankruptcy cases, as set forth in detail in this Disclosure Statement and the accompanying Plan.**

**It is important for all creditors to understand that the Plan proposes a liquidation of all assets of Ford's Colony Country Club, Inc. ("Ford's Colony").  As a general rule, assets used in the operations of the Ford's Colony Golf Club (the "Golf Club") will be conveyed to Prudential as the new owner.  Other assets such as litigation recoveries will be used to pay creditors.**

**The amount of proceeds available and the corresponding return to unsecured creditors will not be known until such time as all assets have been liquidated, and the liquidation will continue after the Ford's Colony Plan is confirmed.  Secured creditors other than Prudential will be paid their allowed claims in full on the Effective Date.  General unsecured Creditors will receive distributions within 30 days after the Effective Date, or as soon as practicable thereafter, and then not less than annually, beginning on the one year anniversary of the Effective Date of the Plan.  It is anticipated that unsecured creditors will be paid within two (2) years.  A pro forma setting forth an example of the anticipated distribution to unsecured creditors is attached hereto as Exhibit B.  Exhibit B includes (i) the anticipated distribution in both this case and in the Marsh Hawk case, given that the payment to creditors of FCCC comes, in part, from revenues derived from the Club; and (ii) an analysis of the Club's anticipated operating revenues given the changes that that Proponents believe will be associated with professional management.**

**Because member dues fund the Club's operations, the Plan is designed to provide a definite payment to secured and unsecured creditors over a short period of time, thus deleveraging the Club so that member dues can be spent on maintenance of the golf course and related facilities, not on the repayment of creditors.**

**(B)    Treatment of Members.**

   **(1)    Member Claims.**

   For those creditors who are members of the Golf Club, the Plan cancels each member's existing membership agreement and offers membership in the new golf club to be established by Prudential. Damage claims, if any, arising from the cancellation of these agreements, including bond claims, will be general unsecured claims treated in Class 3 of the Plan. Exhibit B sets forth an estimate of the potential recovery on those claims.

   **(2)    The New Golf Club.**

   In the companion case of Marsh Hawk, LLC, Prudential is to become the owner of the real property comprising the Golf Club. Prudential, working with a professional golf course management company, will establish a new golf club on the premises (the "New Club"). Existing members of the Golf Club will be offered membership in the New Club. Membership in the New Club will be, at a minimum, upon the following terms:

   (i)    existing members will not be required to pay a one-time initiation fee;

   (ii)    existing members will receive credit for pre-paid trail fees or other fees paid in advance for a period that has not expired during 2011 and the proportional amount of these fees shall be paid to Prudential as the owner of the New Club;[1]

   (iii)    existing members will be required to pay monthly dues going forward, which are anticipated to remain at existing levels for at least the first year under the New Club;

   Because the New Club will be managed by a professional golf course management company, the nature of the benefits offered, the amount of the monthly dues, and other details regarding the operations of the New Club will not be determined until Prudential selects the management company.

   Prudential and the Committee conducted telephonic interviews of three professional golf course management companies during the first week of March, 2011. The CCMA, at the invitation of Prudential and the Committee, also participated in those interviews. The golf course management companies interviewed were: (a) Affiniti Golf Partners; (b) Pinnacle Golf Properties; and (c) Golf Resources. Each of these entities is well-qualified to manage the New Club. Members can get additional information on each of these entities either (i) over the internet at the following addresses: Affiniti Golf Partners http://www.affinitigolf.com/sites/courses/affinitigolf.asp?id=565&page=29447; (b) Pinnacle Golf Properties http://www.pgpllc.net/; and (c) Golf Resources

---

[1]    By way of example, a member who pre-paid trail fees for the entire year on January 1, 2011, and joins the New Club on July 1, 2011, will receive credit for 6 months worth of trail fees (i.e., July through December) and Cash on hand equal to this amount shall be paid to Prudential as the owner of the New Club.

http://www.golfresourcesgroup.com/.  While Prudential will make the final selection of the management company in the event that its proposed Plans are confirmed, it will make that selection based upon input from the Committee and the CCMA.  The management company will be presented with the list of existing member benefits previously circulated by the CCMA in this case, and will work with the CCMA and Prudential in order to insure a smooth transition for all members.

**(C)     This Disclosure Statement.**

On March _____, 2011, the Bankruptcy Court entered an order finding that this Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code.  "Adequate information" is generally defined as "information of a kind, and in sufficient detail that would enable a hypothetical investor to make an informed judgment about the plan."  The Bankruptcy Court has also authorized the Proponents to use this Disclosure Statement to solicit votes for the Plan.

**Prudential and The Official Committee of Unsecured Creditors recommend that Creditors entitled to vote on the Plan vote to accept the Plan.**

### ARTICLE II.   OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and the following overview is qualified in its entirety by the full text of the Plan, which is attached as Exhibit A hereto.

**(A)     The Plan**

The Plan contemplates: (a) a transfer of the Liquor License to Prudential or its designee, in satisfaction of Prudential's perfected security interest in the Liquor License; (b) a sale to Prudential or its designee of all Assets and property of Ford's Colony, other than the Liquor License which is being separately transferred to Prudential[2], Estate Litigation Claims[3], the stock in affiliate entities, and cash, free and clear of all liens, claims, and encumbrances for $100,000.00 plus the allowed amount of the secured claims of other secured creditors who have been identified to be:  Deere & Company, FPC Financial, GE Capital, GMAC, James City County Treasurer, NC Golf Finance, and Vend Lease Company, Inc.   Unless otherwise designated by the Proponents, the assets being sold include, without limitation, the name Ford's Colony Country Club, all agreements, and all property, easements and right of ways, and other Assets that have been used or located at the premises of or in connection with the operation of the golf courses, restaurants, and other businesses and amenities that constitute or are part of the Ford's Colony Country Club, except that no property of Marsh Hawk is included in the Assets being transferred by Ford's Colony in the FCCC Asset Sale to Prudential.  Prudential is not assuming any liabilities associated with the transfer of any assets to Prudential.  For purposes of

---

[2]        Hereafter, any transfers to Prudential referred to herein are deemed to be to Prudential or its designee.

clarity, the assets being sold or transferred to Prudential do not include (i) the stock or membership interests in any subsidiaries of FCCC, or other entities, such as First Choice Realty; (ii) cash on hand; and (iii) Litigation Claims, all of which will be used to make an initial and subsequent payments to creditors.

In exchange for the FCCC Asset Sale, Prudential shall take its Pro Rata share of the Supplemental Prudential Contribution in the Marsh Hawk bankruptcy case on account of the Prudential's Allowed unsecured deficiency claim of $7,170,927.32 under the Valuation Order (as defined in the Marsh Hawk plan) and reallocate any such distribution to non-Insider holders of Allowed Class 3 General Unsecured Claims in the Ford's Colony Bankruptcy Case.

The "**Supplemental Prudential Contribution**" is an amount to be paid by Prudential to the Plan Trustee for distribution equal to (i) 50% of all new membership initiation fees received by Prudential so long as Prudential owns the Prudential Assets; plus (ii) 4% of the Net Sale Proceeds actually paid to Prudential from a third party purchaser of the Prudential Assets if such Prudential Assets are sold within the first 12 months of Prudential's ownership of the Prudential Assets or 3% if sold thereafter; plus (iii) for the lesser of (A) the 24 month period following Prudential's ownership of the Prudential Assets or (B) the period from Prudential's ownership of the Prudential Assets through the date of a sale of the Prudential Assets, 30% of the net cash flow (if any) from the operation of the Prudential Assets which shall be calculated from gross cash flow from the operations of the Prudential Assets (excluding new membership fees or casualty and condemnation proceeds) reduced by (a) an annual return measured from the transfer of Prudential Assets to Prudential of 10% based on Prudential's equity investment of $10.5 million, (b) all actual ordinary operating expenses of the Prudential Assets, (c) a capital expense reserve of the greater of actual capital expenditures or 3% of gross revenues measured on an annual basis from the transfer of Prudential Assets to Prudential, and (d) a contingency reserve of 3% of gross revenues measured on an annual basis from the transfer of Prudential Assets to Prudential. At the time of a sale of the Prudential Assets, the reserves will be turned over to Prudential who shall then contribute 30% of the contingency reserve as part of the Prudential Supplemental Contribution if the 10% annual return to Prudential has been achieved.

The Ford's Colony Plan contemplates that the Proponents will appoint a Plan Trustee to, among other things, make distributions pursuant to the Plan. The Plan Trustee will be compensated hourly at his or her standard hourly rate. The Plan Trustee may be the same for the Ford's Colony Estate and the Marsh Hawk Estate. A post-Confirmation committee, which will initially be composed of the members of the Committee, will be appointed and will oversee and supervise the implementation of the Ford's Colony Plan and the Plan Trustee.

## ARTICLE III.  SOLICITATION AND VOTING PROCEDURES

### (A)    Chapter 11 Generally

Under Chapter 11 of the Bankruptcy Code, a debtor may reorganize its business or sell its assets for the benefit of its creditors, equity interest holders (such as shareholders, partners or members), and other parties in interest. The culmination of a Chapter 11 case is the confirmation and consummation of either a plan of reorganization or a plan of liquidation, which specifies the treatment to be afforded to holders of claims against or equity interests in the debtor in exchange

for the discharge and cancellation of such claims and equity interests. A plan of reorganization or liquidation is implemented only after it has been confirmed by the bankruptcy court. Confirmation of a plan of reorganization or liquidation by the bankruptcy court makes the plan binding on the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of the debtor. Subject to certain limited exceptions, confirmation of the plan releases the debtor from any debt that arose before the date of confirmation of the plan in exchange for the consideration specified under the confirmed plan. Thus, following confirmation, creditors and equity interest holders are deprived of their pre-bankruptcy rights and entitlements and, instead, are limited solely to the rights and entitlements specified by the plan.

Here, the Plan specifies the payments, distributions, and other treatment to be afforded to holders of Allowed Claims against and Equity Interests in Ford's Colony. Certain holders of Allowed Claims, as specified in the Plan, are entitled to vote on the Plan. To confirm the Plan, certain voting requirements and statutory tests must be satisfied. The statutory tests are designed in large measure to protect the interests of holders of Claims or Equity Interests in the Debtor that either are not entitled to vote on the Plan or that vote to reject the Plan, but nevertheless will be bound by the provisions of the Plan if confirmed. A more detailed discussion of these statutory tests is set forth in Article XI(B) of this Disclosure Statement.

**(B)      Solicitation of Acceptances of the Plan**

Under the Plan, all Claims and Equity Interests that are required to be designated in Classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code have been placed in various Classes based on the nature and priority of the Claims or Equity Interests. Each Class is either Impaired or Unimpaired under the Plan. A Class of Claims or Equity Interests that is Unimpaired is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, is not entitled to vote on the Plan. Similarly, a Class of Claims or Equity Interests that does not receive or retain any property under the Plan is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, likewise, is not entitled to vote on that Plan.

**(C)      Voting on the Plan**

The Voting Deadline is _____ __, 2011 at 5:00 p.m. (prevailing Eastern Time). To be counted for purposes of voting on the Plan, all the information requested on the applicable Ballot must be provided. The Proponents reserve the right, in their sole discretion, to extend the Voting Deadline, in which case the term "Voting Deadline" will mean the latest date on which a Ballot will be accepted. To the extent the Voting Deadline is extended by the Proponents, the Proponents will notify you of any extension by oral or written notice and, as promptly as practicable, mail written notice thereof to each record holder of Claims entitled to vote. The notice may state that the Proponents are extending the Voting Deadline for a specified period of time or on a daily basis until 5:00 p.m., prevailing Eastern Time, on the date on which the Proponents have received sufficient acceptances to seek Confirmation of the Plan.

If you are entitled to vote to accept or reject the Plan, enclosed is a Ballot for the acceptance or rejection of the Plan and a pre-addressed return envelope for the return of the Ballot.

> **BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF IMPAIRED CLAIMS IN CLASSES 1, 2, AND 3 BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Please use only the official Ballot or Ballots that accompany this Disclosure Statement. All votes to accept or reject the Plan must be cast using a Ballot. Votes that are cast in any manner other than on the designated Ballot will not be counted. Ballots must be actually received by Prudential, at the addresses indicated on the Ballot, by no later than the Voting Deadline. If you elect to vote on the Plan, you should complete and sign the Ballot in accordance with the instructions on the Ballot, being sure to fill in the amount of your Claim in the appropriate space provided and check the appropriate box entitled "Accept the Plan" or "Reject the Plan." You may not split your vote on the Plan with respect to a particular Class.

If you are the holder of a Claim in Class 1, 2, or 3 and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, the Plan, or the voting procedures in respect thereof, please contact Prudential via its counsel as set forth below. After carefully reviewing this Disclosure Statement, the Plan, and the exhibits annexed hereto and thereto, please indicate on the enclosed Ballot your vote with respect to the Plan.

> **FAILURE TO COMPLY WITH THE VOTING REQUIREMENTS MAY RESULT IN YOUR VOTE NOT BEING COUNTED. YOU MUST RETURN YOUR BALLOT TO PRUDENTIAL BY THE VOTING DEADLINE.**
>
> **THE PROPONENTS BELIEVE THAT PROMPT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS. THE PROPONENTS STRONGLY URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

**(D)     Voting Procedures**

Failure by a holder of a Claim to deliver a duly signed Ballot will constitute an abstention by that holder with respect to a vote on the Plan. Abstentions will not be counted as either acceptances or rejections of the Plan. Because abstentions will have no effect on voting with respect to the Plan, it is extremely important that you timely return your executed Ballot to indicate whether you accept or reject the Plan. Any executed Ballots that are timely received but

do not indicate either an acceptance or a rejection of the Plan or indicate both an acceptance and a rejection of the Plan will not be counted.

Submission of all Ballots must be made directly to Prudential in accordance with the instructions on the Ballots. In all cases, sufficient time should be allowed to assure timely delivery. You may receive multiple solicitation packages. You should only vote one Ballot for each Class of which you are a member.

**(E)**     **Withdrawal of Votes on the Plan**

The solicitation of acceptances of the Plan will expire on the Voting Deadline. A properly submitted Ballot may be withdrawn by delivering a written notice of withdrawal to Prudential at the address set forth on the Ballot at any time before the Voting Deadline. Thereafter, withdrawal of a properly submitted Ballot may be effected only with the approval of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a).

To be valid, a notice of withdrawal must:

-     specify the name of the Claim holder who submitted the vote on the Plan to be withdrawn;
-     contain the description of the Claim; and
-     be signed by the Claim holder in the same manner as on the Ballot.

The Proponents expressly reserve the absolute right to contest the timeliness or validity of any withdrawals of votes on the Plan.

In addition to the withdrawal of a properly executed Ballot as specified above, any Claim holder who has previously submitted a properly executed Ballot on or before the Voting Deadline may revoke and change its vote by submitting to Prudential a subsequent properly executed Ballot. If more than one properly executed Ballot is received from an individual Creditor with respect to the same Claim before the Voting Deadline, only the last properly executed Ballot received by Prudential on or before the Voting Deadline will be deemed to reflect the Claim holder's intent and will supersede and revoke all prior Ballot(s) submitted in connection with such Claim.

**(F)**     **Other General Information**

The Proponents believe that the Plan provides greater value to Creditors than other available alternatives. The Proponents believe that acceptance of the Plan is in the best interests of each and every Creditor entitled to vote on the Plan and recommend that each Creditor vote to accept the Plan. For a more detailed analysis of the alternatives to the Ford's Colony Plan, see Article XII of this Disclosure Statement.

# ARTICLE IV.  BACKGROUND REGARDING DEBTORS

**(A)    General Background**

Marsh Hawk is a Delaware limited liability company that owns certain real property, personal property, and improvements thereon, including an existing three-course, 54-hole golf complex, within a 3,250-unit master plan development, and a two-story, 23,000 square foot clubhouse, which houses locker rooms, a dining room, grill room, banquet room, pro shop, meeting rooms, and administrative offices.  The golf complex is located in proximity to Colonial Williamsburg on the west side of Route 199, between Norfolk and Richmond.  The golf complex that Marsh Hawk owns is commonly known as the Ford's Colony Country Club.  The sole member of Marsh Hawk is Marsh Hawk Holding, LLC.

Ford's Colony is a North Carolina corporation that manages the Country Club for Marsh Hawk pursuant to a management contract with Marsh Hawk.  Ford's Colony is the sole member of Marsh Hawk Holding, LLC.

In 2007, Textron made a loan to Marsh Hawk in the original principal amount of $18,000,000.00, which is evidenced by the Promissory Note, dated December 26, 2006, as amended and modified from time to time.  Although the note was originally payable to Textron, Textron subsequently assigned a 97.25% interest in the Note to Prudential.  In connection with the Note, Marsh Hawk executed: (i) a Deed of Trust, Security Agreement and Fixture Filing, dated December 26, 2006, which was recorded in the real property records of James City County, Virginia as Instrument No. 060031479; (ii) an Assignment of Lease, Rents and Contracts, dated December 26, 2006, which was recorded in the real property records of James City County, Virginia as Instrument No. 060031480; and (iii) a Security Agreement, dated December 26, 2006.

In late 2008 and early 2009, Marsh Hawk missed several debt service payments to Prudential, each of which constituted an event of default under the loan documents.  Based on Marsh Hawk's defaults, Prudential petitioned the Circuit Court for the City of Williamsburg to appoint a Receiver.  Thereafter, the Circuit Court entered an order appointing a Receiver effective April 2, 2010.  Before the effective date of the receivership order, however, Marsh Hawk, along with Ford's Colony, filed their independent bankruptcy petitions.

**(B)    The Debtors' Statements About Their Financial Distress in the Bankruptcy Cases**

Marsh Hawk's and Ford's Colony's affiliates and owners have had severe financial distress and setbacks during the recent economic downturn.  Information about this is set forth in the transcripts of the hearings held on November 17, 2010 (pages 75-79) and January 18, 2011 (pages 62-68, 101-102), and the judgments against Richard Ford, Sr. obtained by Southern Bank & Trust Company, BA Home Loans Servicing LP.  Copies of the transcripts and the judgments can be obtained from the Proponents upon request.

# ARTICLE V.   DESCRIPTION OF THE PLAN

**(A)     Treatment of Unclassified Claims**

Certain types of Claims are not placed into voting Classes; instead, they are unclassified. These Claims are not considered Impaired, and the holders of these Claims do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.

**(1)          Administrative Claims**

Administrative Claims are Claims for costs or expenses of administering the Debtor's Bankruptcy Case, which are provided for in Bankruptcy Code Section 507(a)(1).   The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to different treatment.

If the Plan is confirmed, the Court will send out a separate notice of a deadline known as the Administrative Claim Bar Date for the filing of all requests for payment of Administrative Claims.  Any request for payment of an Administrative Claim that is not timely filed on or before the Administrative Claim Bar Date will be forever barred and Disallowed.

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims must be filed and served on the Proponents and the Plan Trustee and their counsel no later than the Administrative Claims Bar Date.  Any Person or Entity that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such a request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof.  Such request for payment of Administrative Claims must include at a minimum (i) the name of each Debtor that is purported to be liable for the Administrative Claim, (ii) the name of the holder of the Administrative Claim, (iii) the amount of the Administrative Claim, (iv) the basis of the Administrative Claim, and (v) supporting documentation for the Administrative Claim.  FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND RELEASED.

> **UNDER THE PLAN, THE ADMINISTRATIVE CLAIMS BAR DATE IS THE DATE THAT IS THE FIRST BUSINESS DAY SIXTY (60) CALENDAR DAYS AFTER THE EFFECTIVE DATE OF THE PLAN.  ALL REQUESTS FOR PAYMENT OF ADMINISTRATIVE CLAIMS ARISING ON OR BEFORE THE EFFECTIVE DATE, EXCLUDING CLAIMS OF PERSONS AND ENTITIES THAT SUPPLIED GOODS OR RENDERED SERVICES TO THE DEBTORS IN THE ORDINARY COURSE OF BUSINESS, MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE PROPONENTS AND THE PLAN TRUSTEE ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE OR BE FOREVER BARRED.**

The following chart lists all of the Debtor's known and anticipated § 507(a)(1) Administrative Claims and their treatment under the Plan.  Of course, the Administrative Claims may be greater than the amounts estimated below.

| Name | Approximate Amount Owed | Treatment |
|---|---|---|
| Professional Fees and expenses for Debtor's Bankruptcy Court authorized Professionals | $400,000.00 (Est.)<br><br>Will need to be apportioned between Ford's Colony and Marsh Hawk | Paid on the Effective Date, subject to and after allowance through Bankruptcy Court approval of fees |
| Professional Fees and expenses for Committee's Bankruptcy Court authorized Professionals | $75,000.00 (Est.)<br><br>Will need to be apportioned between Ford's Colony and Marsh Hawk | Paid on the Effective Date, subject to and after allowance through Bankruptcy Court approval of fees |
| Clerk's Office Fees | $0.00 | Paid in full on Effective Date |
| U.S. Trustee | $TBD | Paid in full on Effective Date |

**(2)      Bankruptcy Court Approval of Professional Fees**

Professional Fees Claims are treated in all respects as Administrative Claims under the Plan and, thus, subject to the Administrative Claims Bar Date.  As a prerequisite to allowance and therefore payment, the Bankruptcy Court must, upon a timely request for payment of Professional Fees, consider and may approve all Professional Fees listed in the chart above. Professional Fees that are not approved are Disallowed and will not be paid.  For all Professional Fees, except Clerk's Office fees and U.S. Trustee's fees, the Professional in question must file and serve a properly noticed Professional Fee application, and the Bankruptcy Court must rule on the application.  Only the amount of Professional Fees Allowed by the Bankruptcy Court will be required to be paid under the Plan.

**(3)      Payment of Administrative Claims in General**

Except to the extent a holder of an Allowed Administrative Claim agrees to other, lesser treatment, each holder of an Allowed Administrative Claim (including holders of Allowed Professional Fee Claims) will receive from the Plan Trustee, in full satisfaction of its Allowed Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on the

Effective Date or if the Administrative Claim is not Allowed as of the Effective Date, when Allowed.

**(4)        Priority Tax Claims**

Priority Tax Claims are Claims asserted by Governmental Units that are entitled to priority under section 507(a)(8) of the Bankruptcy Code. The Bankruptcy Code does not require Priority Tax Claims to be classified under the Plan, but requires that such Claims receive the treatment described below. Pursuant to § 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the Plan Trustee, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its unpaid Priority Tax Claim, Cash equal to the Allowed amount of such Claim either (A) on the Effective Date or (B) if the Priority Tax Claim is not Allowed as of the Effective Date, when Allowed.

**(B)        Treatment of Classified Claims and Equity Interests under the Ford's Colony Plan**

In the Ford's Colony Plan, all Claims and Equity Interests, except Administrative Claims and Priority Tax Claims, are placed in the following Classes:

| Class | Claim | Status | Voting Rights |
|:---:|:---|:---:|:---:|
| 1 | Prudential Allowed Secured Claim | Impaired | Entitled to Vote |
| 2 | Other Secured Creditors | Impaired | Entitled to Vote |
| 3 | Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Equity Interests | No Distribution | Not Entitled to Vote; Deemed to Reject |

**(1)        Summary of Estimated Distributions**

**Prudential Allowed Secured Claim**. On account of the Prudential Allowed Secured Claim, Prudential or its designee shall receive a transfer of all the Debtor's right, title, and interest in and to the Liquor License, which shall be transferred and assigned to Prudential free and clear of all Liens, Claims, encumbrances, and interests, except those Liens, Claims, and encumbrances of Prudential. Such transfer shall become effective immediately on the Effective Date pursuant to Bankruptcy Rule 7070 and without the necessity of a Final Order. The Prudential Allowed Secured Claim is Impaired and, therefore, Prudential is entitled to accept or reject the Plan.

**If you are the holder of an Allowed Administrative or Priority Tax Claim**. In accordance with section 1129(a)(9) of the Bankruptcy Code, Allowed Administrative Claims, including Allowed Professional Fee Claims, and Allowed Priority Tax Claims will be paid in Cash in full on the Effective Date or, if such claims are not Allowed as of the Effective Date,

when Allowed. Accordingly, holders of Allowed Administrative Claims, including Allowed Professional Fee Claims, and Allowed Priority Tax Claims will receive 100% of the Allowed amount of their claims.

**If you are holder of an Other Secured Creditor Claim**. Each holder of Other Secured Claims will be treated as being in its own sub-class for all purposes. The holders of the Other Secured Claims are: Deere & Company, FPC Financial, GE Capital, GMAC, James City County Treasurer, NC Golf Finance, and Vend Lease Company, Inc. Each holder of the Other Secured Claims shall be paid the full allowed amount of the their secured claim including any accrued and unpaid interest as of the Effective Date such that the collateral of the Other Secured Creditors shall be sold and transferred to Prudential or its designee free and clear of Liens of the Other Secured Creditors.

The Other Secured Claims that are to be paid in full on the Effective Date and the amount of their claims are summarized in the following chart:

| Creditor Name | Claim Amount | POC No. or Schedule Location | Notes |
|---|---|---|---|
| GMAC | $4,206.71 | 1 | 2004 Chevrolet Truck; certificate of title shows notation of security interest |
| Vend Leasing Co. | $7,072.00 | 2 | Leased Equipment; although POC states that perfection is by UCC-1; no supporting documentation is attached as required under Bankruptcy Code and Rules |
| Treasurer - James City County | $83.34 | 3 | Real Estate Taxes |
| Deere & Company | $9,633.91 | 36 | 1 New 3520 Compact Utility Tractor; basis for perfection UCC-1 (attached) |
| Deere Credit, Inc. | $25,612.32 | 37 | Lease Agreement; Greens Mower and GPS Units; No UCC-1s attached; says basis for perfection is lease |
| FPC Financial | $1,744.64 | 77 | 3520 Compact Utility Tractor; UCC-1 attached |
| GE Capital Corp. | $41,264.59 | 102 | Turf Care Equipment; UCC-1 attached |
| NC Golf Finance | $12,734.02 | FCCC Schedule D | Noncontingent, undisputed, liquidated |
| NC Golf Finance | $7,542.21 | FCCC Schedule D | Noncontingent, undisputed, liquidated |

**If you are a party to an executory contract or unassumed lease**. The executory contracts with **Marriott Ownership Resorts, Inc.** consisting of the May 11, 1993 Golf Facility Use, Access and Easement Agreement and the amendments thereto and any equipment lease with any **equipment lessor** that may be determined to be a party to a true lease and not a secured

claimant in Class 2, will have their **contract and lease assumed and assigned to Prudential or its designee** who shall perform thereunder. At the option of the lessor on an equipment lease, Prudential shall purchase the leased equipment in accordance with the lease. All other parties to executory contracts and unexpired leases shall have their contracts and leases rejected and thereby become holders of **Class 3 General Unsecured Claims**.

**If you are a Class 3 General Unsecured Creditor**. Holders of Allowed Class 3 General Unsecured Claims shall receive a Pro Rata distribution of any recovery from Estate Litigation Claims and the net proceeds after payment of secured claims and Allowed Administrative Expense Claims from the FCCC Asset Sales and from other assets not being sold to Prudential including the ownership of First Choice Realty and cash on hand. Pending allowance or disallowance of unsecured claims that are disputed and therefore are the subject of an unresolved objection, the Plan Trustee shall be vested with the operational control of First Choice Realty. General Unsecured Creditors include any individual or entity that holds an unsecured monetary claim against FCCC. These creditors include (i) trade creditors; (ii) members of the Golf Club who will have monetary claims against FCCC based on the rejection and breach of their agreements; (iii) resigned members of the Golf Club who have monetary claims against FCCC; and (iv) any other individual or entity owed money by FCCC.

**If you are a non-Insider General Unsecured Creditor**. In addition to the distributions described in the immediately preceding paragraph, non-Insider holders of Allowed Class 3 General Unsecured Claims shall also receive a Pro Rata distribution comprised of the amount of the distribution to Prudential from the Supplemental Prudential Contribution under the Marsh Hawk plan proposed by Prudential in the Marsh Hawk bankruptcy case.

**If you are a holder of an Equity Interest in Ford's Colony.** You will receive nothing under the Ford's Colony Plan, and your Equity Interest will be cancelled because Ford's Colony is insolvent and its Creditors will not be repaid in full.

### (2) Timing of Distributions

Within 30 days of the Effective Date or as promptly thereafter as is practicable, the Plan Trustee may begin making distributions to holders of Class 3 Claims Allowed as of the Effective Date. The timing of subsequent distributions under the Ford's Colony Plan is currently unknown, and such distributions will be made by the Plan Trustee in the Plan Trustee's discretion.

## (C) Effect of Confirmation of the Ford's Colony Plan

### (1) Binding Effect

On and after the Confirmation Date, and subject to the occurrence of the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interests in, the Debtor and its respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has voted to accept the Plan, and whether or not such holder will receive a distribution.

**(2)       Certain Estate Assets to Remain in Estate; No Revesting of Estate Assets**

Notwithstanding section 1141(b) of the Bankruptcy Code and except as otherwise provided for in the Plan, property of the Estate, including Estate Litigation Claims, shall not revest in the Debtor, but shall remain property of the Ford's Colony Estate subject to the jurisdiction of the Bankruptcy Court, under the exclusive control of the Plan Trustee, until distributed to holders of Allowed Claims in accordance with the provisions of the Plan and the Confirmation Order.

**(3)       Effect of Confirmation on Third Parties**

Nothing contained in the Plan alters or affects any obligation of any guarantor to any creditor or any claims of any creditor against any person or entity not a debtor in this case.

**(4)       Injunction Against Interference with the Plan**

Upon the entry of the Confirmation Orders, the Debtor and all holders of Claims and Equity Interests, Insiders, Affiliates, and other parties in interest, along with their respective present and former employees, agents, officers, directors, and principals shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan, except that parties in interest shall not be precluded from pursuing any appeals of the Confirmation Order.

## ARTICLE VI.   MEANS FOR IMPLEMENTATION OF THE PLAN

**(A)       The Plan Trustee**

The Plan contemplates the appointment of the Plan Trustee on the Effective Date to administer certain post-Effective Date responsibilities and exercise post-Effective Date rights under the Plan.  The Plan Trustee will be compensated hourly at his or her standard hourly rate. On or before the Confirmation Hearing, Prudential and the Committee shall select the Plan Trustee and file a designation of the Plan Trustee with the Bankruptcy Court, who shall serve as the Plan Trustee unless not approved by the Bankruptcy Court at the Confirmation Hearing, in which event Prudential and the Committee shall identify another Plan Trustee within 10 Business Days thereafter.  Prudential and the Committee shall select any successor Plan Trustees as may become necessary.  As of the Effective Date and except as otherwise provided herein, the Plan Trustee will be vested with the exclusive power, authority, and control over all of the property and Assets of the Debtor and the Estate and with the empowerment and obligation to make distributions in accordance with the Plan.  The Plan Trustee will be deemed as of the Effective Date to be the general representative of the Estate as authorized by the Bankruptcy Code in all respects, with all necessary and appropriate power to act for, on behalf of, and in the name of the Debtor, with the same power and effect as if its actions in furtherance of its duties as a responsible person and as a Bankruptcy-Court appointed officer.  The initial Plan Trustee and each successor Plan Trustee shall serve until the later of (a) the entry of the Final Decree or (b) payment of final distributions pursuant to the Plan.  The Plan Trustee may be the same for Ford's Colony and Marsh Hawk.

The Plan Trustee shall be deemed the Ford's Colony Estate representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Plan. The Plan Trustee shall be authorized and empowered as a representative of the Estate and shall have the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, including, without limitation, the right to: (1) effect all actions and all agreements, instruments, and other documents necessary to implement the provisions of the Plan; (2) liquidate any of the Debtor's Assets; (3) make distributions to holders of Allowed Claims in accordance with the Plan; (4) object to Claims and prosecute, settle, or otherwise resolve such objections; (5) establish and administer any necessary reserves for Disputed Claims that may be required; (6) perform administrative services related to implementation of the Plan; (7) complete and file federal, state, and local tax returns, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid Tax liability of the Debtor or its Estate for any Tax incurred during the administration of the Bankruptcy Case, as determined under applicable Tax laws; (8) prepare and file post-confirmation reports with the U.S. Trustee and pay any post-confirmation fees to the U.S. Trustee; and (9) employ and compensate professionals. The Plan Trustee shall be permitted to pay any necessary fees and expenses incurred, including compensation of professionals without seeking Court approval.

**(B)     Dissolution of the Creditors' Committee and Formation of Post-Confirmation Committee**

On the Effective Date of the Plan, the Committee shall automatically dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and rising from the Bankruptcy Cases, and the members shall thereafter be reconstituted as the "**Post-Confirmation Committee**" to consult with the Plan Trustee and take such other actions as are necessary and appropriate to further the interests of the non-Insider General Unsecured Creditors. The retention and employment of Professionals retained by the Committee shall terminate as of the Effective Date, provided, however, that the Committee shall exist, and its Professionals shall be retained, after such date with respect to (a) requests for the payment of Professional Fee Claims and (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order.

**(C)     Plan Funding and Sources of Cash**

To the extent funds are not available from Cash on hand and the proceeds of Estate Litigation Claims to make the payments required by the Plan, Prudential shall provide the funding necessary to pay Allowed Priority Tax Claims and Allowed Administrative Claims. Prudential shall also provide the $200,000.00 pursuant to the FCCC Asset Sale and shall pay its Pro Rata share of the Prudential Supplemental Contribution under the Marsh Hawk plan to non-Insider holders of Allowed Class 3 General Unsecured Claims. Finally, Prudential shall provide the necessary funding to cure any monetary defaults with respect to any assumed and assigned Executory Contracts and/or Unexpired Leases.

**(D)     The New Club and Membership**

All current members and all resigned members of the Fords Colony Country Club will be invited to join the New Club and to accept that offer within 75 days of the Effective Date.

Current members may join the new club without paying a new initiation fee. Resigned members may join the New Club by paying a new discounted initiation fee in an amount to be determined by Prudential and the CCMA. Members of the New Club will be expected to pay dues as a condition of continued membership.

In connection with and after receiving a transfer of the Prudential Assets, Prudential will consult with the CCMA and the Post-Confirmation Committee regarding the selection of a manager for the New Club and other management and operational decisions, and in that regard, desires and expects to have a close working relationship with both the CCMA and the Post-Confirmation Committee with the goal of maximizing the quality of the New Club, and thereby, its membership and the value of Prudential's Assets.

**(E)    Reimbursement of Prudential for Certain Plan Funding**

To the extent Prudential funds to the Plan Trustee any monies to be used to pay Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Professional Fee Claims, or any funds to cure monetary defaults in connection with Executory Contracts and Unexpired Leases assumed and assigned pursuant to the Plan, such funds advanced by Prudential shall constitute a loan to the Estate and the Plan Trustee deemed approved under section 364 of the Bankruptcy Code, which loan shall be secured by a lien senior to all other Liens, Claims, and encumbrances in all of the Assets and property of the Debtor, and the Estate. Except for the $200,000.00 payment under the FCCC Asset Sale and the Supplemental Prudential Contribution as set forth above, Prudential shall be entitled to be reimbursed all amounts advanced by Prudential to pay for Allowed Administrative Claims, including Allowed Professional Fee Claims, and any amounts Prudential advances to cure monetary defaults in assumed Executory Contracts and Unexpired Leases before any other Creditor receives a distribution under the Plan.

**(F)    Directors, Officers, and Managers of the Debtor**

On the Effective Date, the authority, power, and incumbency of the Persons then acting as directors, officer, or managing members of the Debtor shall be terminated.

**(G)    Operations of the Debtor Between the Confirmation Date and Effective Date**

The Debtor shall continue to operate as a debtor in possession during the period from the Confirmation Date through the Effective Date, provided, however, that Prudential and the Plan Trustee shall be permitted to file a notice of occurrence of the Effective Date without the need to contact or obtain consent from the Debtor.

## ARTICLE VII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**(A)    Certain Executory Contracts and Unexpired Leases May Be Assumed**

The executory contracts with **Marriott Ownership Resorts, Inc.** consisting of the May 11, 1993 Golf Facility Use, Access and Easement Agreement and the amendments thereto and any equipment lease with any **equipment lessor** that may be determined to be a party to a true

lease and not a secured claimant in Class 2, will have their **contract and lease assumed and assigned to Prudential** who shall perform thereunder. At the option of the lessor on an equipment lease, Prudential shall purchase the leased equipment in accordance with the lease. All other parties to executory contracts and unexpired leases shall have their contracts and leases rejected and thereby become holders of **Class 3 General Unsecured Claims**.. The entry of the Confirmation Order shall constitute approval of any such assumptions and assignments pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**(B)      Rejection of Executory Contracts and Unexpired Leases on Effective Date**

On the Effective Date, except as provided above for executory contracts that are being assumed, and except for any Executory Contracts or Unexpired Leases that were previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, each Executory Contract and Unexpired Lease of every kind and nature entered into by the Debtor before the Petition Date that has not previously expired or terminated pursuant to its own terms before the Effective Date will be rejected pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code.

For the avoidance of doubt, (i) the management contract between Marsh Hawk and Ford's Colony shall be rejected upon entry of the Confirmation Order; and (ii) among the executory contracts being rejected are (x) all membership agreements for Golf Club members and (y) the 90 Golf Club memberships purported to have been acquired by Realtec, an affiliate of the Debtor and owned by the Ford Family.

**(C)      Claims for Rejection Damages**

Proofs of Claim for damages allegedly arising from the rejection of any Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Bankruptcy Court not later than 30 days after the Effective Date. All proofs of Claim for such damages not timely filed and properly served as prescribed herein shall be forever barred and the holder of such a Claim shall not be entitled to participate in any distribution under the Plan. Allowed Claims arising from the rejection of Executory Contracts and/or Unexpired Leases shall be classified and treated in Class 3 General Unsecured Claims.

> **UNDER THE PLAN, THE REJECTION CLAIMS BAR DATE IS THIRTY (30) CALENDAR DAYS AFTER THE EFFECTIVE DATE. ALL REJECTION CLAIMS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE PLAN TRUSTEE ON OR BEFORE THE REJECTION CLAIMS BAR DATE OR BE FOREVER BARRED.**

**(D)      Objections to Proofs of Claim Based on Rejection Damages**

Under the Plan, the Plan Trustee shall have until the Claims Objection Bar Date to object to any proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease.

# ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS

**(A)    Initial Distributions**

Within 15 days of the Effective Date or as promptly thereafter as is practicable, the Plan Trustee may begin making distributions to holders of Class 3 Claims Allowed as of the Effective Date of the Plan.  The amount of such distributions will be calculated as if each then-unresolved Disputed Claim in Class 3 were an Allowed Claim in its Face Amount.  Distributions may be made periodically in the discretion of the Plan Trustee.

**(B)    Disputed Claims**

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not Disputed, unless and until such Disputed Claim becomes an Allowed Claim.  No distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.

**(C)    Disputed Claim Reserve**

The Plan Trustee will establish a reserve for distributions to holders of Disputed Claims (the "**Disputed Claims Reserve**") for the Estate.  The Plan Trustee will only fund the Disputed Claims Reserve at the time the holders of Claims in the Class of a Disputed Claim generally receive distributions under the Plan and for which the holder of the Disputed Claim would have received a distribution if the holder's Claim was Allowed and not Disputed.  The amount of the Disputed Claims Reserve will be equal to the distribution the holder of the Disputed Claim would have otherwise received if the holder's Claim was Allowed and not Disputed.

**(D)    Plan Expense Reserve**

On the Effective Date, the Plan Trustee may establish a reserve from the Cash established to pay Class 3 Allowed General Unsecured Claims under the Ford's Colony Plan to pay the fees and expenses of the Plan Trustee and any professional the Plan Trustee has or anticipates hiring in order to carry out the duties of the Plan Trustee (the "**Plan Expense Reserve**").  The Plan Trustee may increase or decrease such reserves as the Plan Trustee deems appropriate in his or her business judgment.  Any funds remaining in the Plan Expense Reserve after payment of all such expenses shall be used to make payment to Allowed Class 3 Claims pursuant to the Plan.

**(E)    Distributions on Account of Disputed Claims Once Allowed**

On each Distribution Date, the Plan Trustee will make all distributions on account of any Disputed Claim that has become an Allowed Claim.

**(F)    Estimation of Claims**

The Plan Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code Section 502(c) regardless of whether the Debtor or any other party in interest previously objected to such Claim, or whether

the Bankruptcy Court has ruled on any such objection. If the Bankruptcy Court estimates any Claim, that estimated amount will constitute the Allowed Amount of such Claim for voting on the Plan, but will not constitute a maximum limitation on such Claim for distribution purposes unless the parties agree to allow the estimation to serve as such a maximum.

**(G)     Interest on Allowed Claims**

Unless otherwise specifically provided for or contemplated elsewhere in the Plan or Confirmation Order, or required by applicable bankruptcy law to render a Claim Unimpaired or otherwise, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

**(H)     Setoff Rights**

The Plan Trustee may set-off against any Allowed Claim (and distributions to be made thereto), the claims, rights and causes of action of any nature (regardless of whether such claims, rights, or causes of action are reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured) that the Debtor or the Estate may hold under applicable non-bankruptcy law (and notwithstanding any limitations or restrictions placed on such rights under the Bankruptcy Code) against the holder of such Allowed Claim or any recipient of any distribution in respect of an Allowed Claim, provided, however, that no right of setoff may be asserted against any Claim that is Allowed by operation of the Plan.

**(I)     Manner of Payments; Delivery of Distributions**

The Plan Trustee will make all distributions pursuant to the Plan in Cash made by check drawn on a domestic bank or by wire transfer from a domestic bank. Subject to the provisions of Bankruptcy Rule 2002(g) and except as otherwise provided under the Plan, the Plan Trustee will make distributions to holders of Allowed Claims at each holder's address set forth on the Schedules filed with the Bankruptcy Court unless superseded by a different address set forth in a timely filed proof of Claim filed by the holder or if the Plan Trustee has been notified in writing of a change of address.

## ARTICLE IX.   OTHER PLAN MATTERS

**(A)     Post-Confirmation Litigation and Claims Resolution Procedures**

Except as otherwise provided in the Plan, in a Final Order, or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with the provisions of the Bankruptcy Code, including but not limited to section 1123(b) of the Bankruptcy Code, the Plan Trustee shall be vested with, retain, and may exclusively enforce and prosecute any claims or causes of action that the Debtor or the Estate may have against any Person or Entity. The Plan Trustee may pursue such retained claims or causes of action in accordance with the best interests of the Creditors of Debtor and the Estate. Without further order of the Bankruptcy Court, the Plan Trustee shall be substituted as the party in interest in all adversary proceedings pending on the Effective Date.

Estate Litigation Claims shall include, without limitation, all the Debtor's pending lawsuits filed against Union First Market Bank, Citizens and Farmers Bank, all claims against Insiders, Affiliates, officers, directors, members, and/or managers for breach of fiduciary and other duties, and for recovery of debts owed to the Debtor, and all claims for recovery of any potential avoidable transfers as identified in response to Questions 3, 4, and 10 of the Debtor's Statement of Financial Affairs, as amended and modified from time to time. A non-exclusive list of Persons and Entities that may be subject to Estate Litigation Claims includes Richard Ford, Sr., Brian Ford, the estate of Richard Ford, Jr., and Mike Tiernan, as well as the persons and entities identified in response to Questions 3, 4, and 10 of the Schedules and Statement of Financial Affairs of Ford's Colony.

Except as otherwise set forth in the Plan, the Plan Trustee, and only the Plan Trustee, in consultation with Prudential and the Post-Confirmation Committee, will prosecute, settle, or decline to pursue the Estate Litigation Claims whether such Estate Litigation Claims were commenced before or after the Effective Date. Except as otherwise ordered by the Bankruptcy Court, prior to filing or settling any Estate Litigation Claim where the Plan Trustee reasonably believes that the amount in controversy in such Estate Litigation Claim will exceed $25,000.00, the Plan Trustee will obtain the prior consent of Prudential and the Post-Confirmation Committee for the filing or settlement of such Estate Litigation Claim.

Any proceeds realized from pursuit of Estate Litigation Claims will be made available for distribution on Allowed Claims in accordance with the provisions of the Plan.

**THE PLAN TRUSTEE, POST-CONFIRMATION COMMITTEE, AND PRUDENTIAL HAVE NOT FULLY INVESTIGATED THE ESTATE LITIGATION CLAIMS. THIS INVESTIGATION IS ON-GOING AND MAY OCCUR AFTER CONFIRMATION OF THE PLAN. CREDITORS AND OTHER PARTIES IN INTEREST ARE ADVISED THAT, NOTWITHSTANDING THAT THE EXISTENCE OF A PARTICULAR ESTATE LITIGATION CLAIM MAY NOT BE LISTED, DISCLOSED, OR SET FORTH IN THE PLAN, DISCLOSURE STATEMENT, OR IN OTHER DOCUMENTS FILED IN THIS BANKRUPTCY CASE, SUCH ESTATE LITIGATION CLAIM MAY STILL BE BROUGHT AGAINST ANY CREDITOR OR PARTY IN INTEREST AT ANY TIME (SUBJECT TO ANY APPLICABLE STATUTE OF LIMITATIONS AND OTHER LIMITATIONS SET FORTH IN THE PLAN).**

Estate Litigation Claims shall include, without limitation, all the Debtors' pending lawsuits filed against Union First Market Bank (Adversary Proceeding No. 10-05033), Citizens and Farmers Bank (Adversary Proceeding No. 10-05034), all claims against Insiders, Affiliates, officers, directors, members, and/or managers for breach of fiduciary and other duties, and for recovery of debts owed to the Debtor, and all claims for recovery of any potential avoidable transfers as identified in response to Questions 3, 4, and 10 of the Debtors' Statements of Financial Affairs, as amended and modified from time to time, all of which are incorporated herein by reference. Attached as Exhibit A to the Plan is a non-exclusive list of Persons and

Entities that may be subject to Estate Litigation Claims, as well as the relevant portions of the Schedules and Statement of Financial Affairs of Marsh Hawk

**(B)      Conditions Precedent to Confirmation and Effective Date of the Plan**

The following are conditions precedent to the Effective Date of the Plan: (a) the Bankruptcy Court has entered the Confirmation Order in a form reasonably acceptable to the Proponents; (b) no stay of the Confirmation Order is in effect; (c) all of the other actions needed to be taken or documents needed to be executed or approved to implement the Plan, as determined in Prudential's sole discretion, have been taken, executed, or approved.

Notwithstanding the foregoing, the Proponents reserve, in their sole discretion, the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent. Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without formal action other than proceeding to consummate the Plan.

**(C)      Retention of Jurisdiction**

From and after the Effective Date, and notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain exclusive jurisdiction over the Bankruptcy Case and all matters arising under, arising out of, or related to, the Bankruptcy Case, the Plan, and the Confirmation Order to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)      hear and determine motions, applications, adversary proceedings, and contested matters pending or commenced after the Effective Date;

(b)      hear and determine objections to Claims (whether filed before or after the Effective Date), or requests for estimation of any Claim, and to enter any order requiring the filing of proof of any Claim before a particular date;

(c)      estimate any Claim at any time, including, without limitation, during litigation concerning any objection to such Claim, including any pending appeal;

(d)      ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(e)      enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)      issue or construe such orders or take any action as may be necessary for the implementation, execution, enforcement and consummation of the Plan and the Confirmation Order, and hear and determine disputes arising in connection with the foregoing;

(g)      hear and determine any applications to modify the Plan, to cure any defect or omission or to reconcile any inconsistency in the Plan, the Disclosure Statement,

or in any order of the Bankruptcy Court including, without limitation, the Confirmation Order;

(h) hear and determine all applications for Professional Fee Claims;

(i) hear and determine other issues presented or arising under the Plan, including disputes among holders of Claims and arising under agreements, and the documents or instruments executed in connection with the Plan;

(j) hear and determine any action concerning the recovery and liquidation of the Estate's Assets, wherever located, including without limitation, litigation to liquidate and recover the Estate's Assets that consist of, among other things, the Estate Litigation Claims, or other actions seeking relief of any sort with respect to issues relating to or affecting Estate Assets;

(k) hear and determine any action concerning the determination of Taxes, Tax refunds, Tax attributes, and Tax benefits and similar or related matters with respect to the Debtor or the Estate including, without limitation, matters concerning federal, state, and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(l) hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code; and

(m) enter the Final Decree.

**(D)  Modification or Withdrawal of the Plan**

The Proponents may alter, amend, or modify the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by applicable law at any time prior to the Confirmation Date. After the Confirmation Date and before the substantial consummation of the Plan, any party in interest in the Bankruptcy Case may, so long as the treatment of holders of Claims or Equity Interests under the Plan are not materially adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, this Disclosure Statement, or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and intents of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

Either or both Proponents may revoke or withdraw the Plan at any time before the Confirmation Date. If either Proponent revokes or withdraws the Plan before the Confirmation Date, the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by Prudential or any other Person or to prejudice in any manner the rights of Prudential or any Person in any further proceedings involving Prudential, including, without limitation, Prudential's right to pursue relief from the automatic stay under section 362(d) of the Bankruptcy Code.

**(E)** **Limitation of Liability; Releases**

*The Plan provides that notwithstanding anything to the contrary contained in the Plan, on or after the Confirmation Date, neither Prudential, the Committee, the Plan Trustee, nor any of their respective members, employees, shareholders, partners, directors, attorneys, accountants, representatives, agents or Professionals employed by any of them, shall have or incur any liability to any Entity for actions taken or omitted to be taken in connection with or relating to the formulation or confirmation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan, other than for gross negligence, willful misconduct, or fraud. This release is limited to the matters set forth herein.*

*The Plan provides further that in consideration of the funding of the Plan and the Supplemental Prudential Contribution, the Plan and the Confirmation Order shall release Prudential and Textron, and their affiliates, and their respective officers, directors, members, managers, attorneys, representatives, and insurers (the "Prudential Releasees") from all actions, causes of action, claims, suits, demands, rights, damages, costs, losses, judgments, debts, obligations and liabilities, whether known or unknown, contingent, liquidated or unliquidated, based on facts now in existence, whether known or unknown, which the Debtors have or may have against the Prudential Releasees arising out of, based upon or relating to the Prudential Releasees' transactions or dealings with and/or relationships to the Debtors, including but not limited to any such actions, causes of action, claims, suits, demands, rights, damages, costs, losses, judgments, debts, obligations or liabilities arising out of, based upon or relating to (i) the debts owed to Prudential and/or Textron, and (ii) these Bankruptcy Cases.*

*The Plan also provides that if, and only if, no objection is filed by any Insider, Affiliates, officer, director, member, and/or manager of the Debtors to confirmation of the*

***Plan and such persons or entities vote in favor of the Plan, then no claims shall be asserted as***

***Estate Litigation Claims against such persons or entities for any debts, obligations, or actions***

***taken prior to the filing of the Bankruptcy Cases.***

## ARTICLE X.   MISCELLANEOUS PROVISIONS OF THE PLAN

**(A)      Exemption from Transfer Taxes Under Section 1146(a)**

Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of the Assets contemplated by the Plan (including real and personal property) shall not be subject to any stamp, real estate transfer, mortgage recording sales, use or similar tax.

**(B)      Nonconsensual Confirmation**

If any Impaired Class of Claims entitled to vote on the Plan shall not accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy Code, the Proponents reserve the right to amend the Plan in accordance with section 1127 of the Bankruptcy Code or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.   With respect to Impaired Classes of Claims or Equity Interests that are deemed to reject the Plan, the Proponents shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

**(C)      Releases of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, or other document created pursuant to the Plan, on the Effective Date, all Liens against Assets of the Debtor's Estate shall be fully released and discharged and all of the right, title, and Debtor's interest in such Assets shall be distributed in accordance with the Plan.

**(D)      Governing Law**

Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal or state laws are applicable, the laws of the Commonwealth of Virginia shall govern the construction, implementation, and enforcement of the Plan and all rights and obligations arising under the Plan, without giving effect to the principles of conflicts of law.

**(E)      Notices and Distributions**

On and after the Effective Date, all notices, requests and distributions to a holder of a Claim or Equity Interest shall be sent to the last known address of (i) the holder or its attorney of record as reflected in the holder's proof of Claim or Administrative Claim filed by or on behalf of such holder, or (ii) if there is no such evidence of a last known address, to the last known

address of the holder according to the books and records of the Debtor.  Any holder of a Claim or Equity Interest may designate another address by providing the Plan Trustee written notice of such address, which notice will be effective upon receipt by the Plan Trustee of the written designation.  Any notices to the Plan Trustee in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) via facsimile with a copy sent via First Class Mail, postage prepaid, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

> *To Prudential:*
>
> Alston & Bird, LLP
> Grant T. Stein
> 1201 West Peachtree Street
> Atlanta, Georgia 30309-3424
> grant.stein@alston.com
>
> *To the Committee:*
>
> Wilson & McIntyre, PLLC
> John D. McIntyre
> 500 East Main Street, Suite 920
> Norfolk, Virginia 23510
> (757) 961-3933

**(F)     Other Documents and Actions**

The Plan Trustee may execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and take such other action as is reasonable, necessary, or appropriate to effectuate the transactions provided for in the Plan, without any further action by or approval of the Bankruptcy Court or the members or manager of the Debtor. On or before the Effective Date, the Proponents may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**(G)     No Stay of Confirmation Order**

In the Plan, the Proponents are seeking a waiver of any stay of enforcement of the Confirmation Order pursuant to Bankruptcy Rules 3020(e) and 7062 or otherwise applicable law.

**(H)     Filing of Additional Documents**

On or before the Effective Date, the Proponents may file such agreements and documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

# ARTICLE XI.   CONFIRMATION OF THE PLAN

## (A)      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after appropriate notice, hold the Confirmation Hearing.  The Bankruptcy Court has established the date and time of the Confirmation Hearing as April __, 2011 at __:___ a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned or continued from time to time by the Proponents or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing or any subsequently adjourned or continued Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.  Objections to Confirmation of the Plan must be filed and served on or before April __, 2011 at _:__ p.m. (prevailing Eastern Time) in accordance with the notice accompanying this Disclosure Statement.

> **UNLESS OBJECTIONS TO CONFIRMATION OF THE PLAN ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## (B)      Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Proponents have satisfied the requirements of section 1129 of the Bankruptcy Code.  If so, the Bankruptcy Court will enter the Confirmation Order.  The Proponents believe that the Ford's Colony Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Proponents have complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or to be made by the Plan Trustee under the Plan for services or for costs and expenses in, or in connection with the Bankruptcy Cases, has been approved by, or is subject to approval of, the Bankruptcy Court as reasonable;

- With respect to each Class of Impaired Claims or Equity Interests, either each holder of a Claim or an Equity Interest in such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value as of the Effective Date of the Plan that is not less than the

amount that such holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code;

- Except to the extent that the holder of a particular Claim agrees to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims will be paid in full (i) on the Effective Date or (ii) on the date such claims become Allowed.

- Except to the extent that the holder of a particular Allowed Priority Tax Claim agrees to a different treatment, the Plan provides that Allowed Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code (i) on the Effective Date or (ii) on the date such claims become Allowed;

- At least one Class of Impaired Claims, not including any acceptance of the Plan by any Insiders (as defined in section 101(31) of the Bankruptcy Code) holding a Claim in such Class, will have accepted the Plan;

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor under the Bankruptcy Code, unless such liquidation or reorganization is proposed in the Plan, which, in these Bankruptcy Cases, such liquidation is proposed; and

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee will be paid as of the Effective Date.

Set forth below is a summary of the relevant statutory confirmation requirements and an analysis of how the Plan satisfy these requirements.

**(1)      Best Interest of Creditors Test**

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of a Claim or Equity Interest in such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. In other words, if an Impaired Class does not unanimously accept the Plan, then the Bankruptcy Court must determine that it is in the "best interests" of each holder of an Allowed Claim or Equity Interest that did not vote to accept the Plan.

In Chapter 7 liquidation cases, unsecured creditors and equity security holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have been paid in full or payment has been provided for:

- Secured Claims (to the extent of the value of their collateral)

- Administrative Claims

- Priority Unsecured Claims

- Unsecured Claims

- Equity Interests

The activities of the Plan Trustee after the Effective Date of the Plan are the very same ones that would be pursued by a Chapter 7 trustee. However, a Chapter 7 trustee could not obtain the contributions from Prudential provided for in the Plan. Specifically, Prudential is making its Pro Rata share of the Supplemental Prudential Contribution under the Marsh Hawk plan to holders of Allowed Class 3 General Unsecured Claims. These contributions by Prudential would not be made in a Chapter 7 liquidation. Therefore, the Proponents have concluded that recoveries to Creditors will be maximized by the transactions contemplated under the Plan. Further, because (i) Prudential is an undersecured creditor and would be entitled to substantially all the Assets of Marsh Hawk, which owns, among other things, the real property upon which Ford's Colony manages the Country Club; and (ii) additional administrative expenses would be incurred in a Chapter 7 liquidation in accordance with the priority scheme set forth in the Bankruptcy Code, specifically those of a Chapter 7 trustee charging statutory fees of up to 3% of disbursements and the cost of the Chapter 7 trustee's professionals, all of whom would need to spend many hours reviewing, understanding, and duplicating the lengthy investigation of the facts and circumstances of the Bankruptcy Case and the Claims against the Debtor already undertaken by the Proponents, the value of any distributions in a Chapter 7 case would be less than the value of distributions under the Plan.

Thus, the Plan satisfy the requirements of section 1129(a)(7) of the Bankruptcy Code because under the Plan all holders of Impaired Claims or Equity Interests will receive distributions, if any, that have a value that is not less than the value of the distribution, if any, that each such holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

**(2)      Feasibility of the Plan**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Bankruptcy Code, unless such liquidation or reorganization is proposed in the Plan. The Plan proposed by the Proponents provides for a liquidation of Ford's Colony, but a reorganization of the Country Club, with Prudential as the owner, and a distribution of the Cash proceeds to Creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. The Debtor will not be conducting any business operations after the Effective Date of the Plan, and the ability to make distributions according to the terms of the Plan do not depend on future earnings or operations of the Debtor. Accordingly, the Proponents believe that the Plan is feasible and satisfy the requirements of section 1129(a)(11) of the Bankruptcy Code.

### (3) Acceptance by Impaired Classes of Claims

As a condition to confirmation of the Plan, the Bankruptcy Code requires that each Class of Impaired Claims and Equity Interests in the Debtor vote to accept the Plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of the Plan by a class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amounts and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or reject the Plan. Thus, a Class of Claims will have voted to accept the Ford's Colony Plan only if two-thirds in dollar amounts and a majority in number actually voting cast their Ballots in favor of acceptance.

In the Ford's Colony Plan, Classes 1, 2, and 3 are entitled to vote. Class 4 Equity Interests are neither receiving nor retaining any property under the Ford's Colony Plan, and thus are deemed to have rejected the Ford's Colony Plan pursuant to section 1126(g) of the Bankruptcy Code. Because Class 4 is deemed to have rejected the Ford's Colony Plan, the Proponents are required to satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Class 4. It is also possible that one or more of the other Classes will reject the Ford's Colony Plan.

### (4) Satisfaction of Confirmation Requirements for Non-Voting Classes

Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances, which mechanism is commonly referred to as "cram down," where the plan is not accepted by all impaired classes of claims and equity security interests. Under section 1129(b) of the Bankruptcy Code, the Court may "cram down" the Plan over the deemed rejection or actual rejection by an Impaired Class, so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to such Classes.

**No Unfair Discrimination**. This test applies to Classes of Claims or Equity Interests in the Debtor that are of equal priority and are receiving different treatment under the Plan. A plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of the dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require the treatment be the same or equivalent, but that such treatment be "fair."

Classes 1, 2, 3, and 4 under the Plan are not similarly situated, and none of the Classes will receive more than it legally is entitled to receive for its Claims. Accordingly, the Proponents believe there can be no discrimination against any of Classes under the Plan.

**Fair and Equitable**. This test applies to classes of different priority and status (that is, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of allowed claims in such class. As to the dissenting classes, this test sets different standards depending upon the type of claims or interests in such class.

(a)    <u>Secured Claims</u>—The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and for each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; (ii) for the sale of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such holders of the indubitable equivalent of such claims.  The Proponents believe that the Plan is "fair and equitable" with respect to Class 2 in the Ford's Colony Plan because the holders of the Allowed Other Secured Claims are receiving the value of the secured portion of their Claims.

(b)    <u>Unsecured Claims</u>—The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest.  The Proponents believe that the Plan is "fair and equitable" with respect to Class 3 in the Ford's Colony Plan because no Class that is junior to Class 3 will receive or retain any property because in Creditors Class 3 are not being paid in full under the Plan.

(c)    <u>Equity Interests</u>—The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of: (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest, or (ii) if the class does not receive the amount as required under (i) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.  The Proponents believe that the Plan satisfies the "fair and equitable" treatment requirement notwithstanding that Class 4 is deemed to reject the Plan because no Class that is junior to Class 4 will receive or retain any property on account of the Claims or Equity Interests in the Debtor in such Class.  Because Class 3 is not being paid in full, the Equity Interests are being extinguished.

# ARTICLE XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## (A) Liquidation Under Chapter 7

The Debtor could be liquidated under Chapter 7 of the Bankruptcy Code. The Proponents believe that liquidation under Chapter 7 of the Bankruptcy Code would result in lower distributions being made to Creditors than those provided for in the Plan because of: (i) Prudential as a secured and an undersecured creditor would be entitled to substantially all the Assets of Marsh Hawk, which owns the real property upon which the Country Club operates; (ii) the likelihood that the Assets of the Debtor would have to be sold or disposed of in a less orderly fashion, and (ii) additional administrative expenses attendant to the appointment of a chapter 7 trustee and the trustee's employment of attorneys and other professionals.

## (B) Alternative Plan of Reorganization

The Proponents believe that the failure to confirm the Plan will entitle Prudential to relief from the automatic stay to foreclose its liens against the assets of Marsh Hawk and if the Debtor tries to prosecute a plan given its financial distress discussed above, it will lead inevitably to an expensive and protracted Chapter 11 Bankruptcy Case and further injury and damage to creditors and the community.

## (C) Dismissal of the Bankruptcy Cases

Dismissal of the Bankruptcy Case would have the effect of restoring (or attempting to restore) all parties to the status quo ante. Upon dismissal of the Bankruptcy Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiation with the Creditors, and possibly resulting in costly and protracted litigation in various jurisdictions. More significantly, dismissal of the Bankruptcy Cases would permit Prudential to foreclose upon the Assets that are subject to Prudential's Liens, which are all of Marsh Hawk's Assets including Cash collateral. Because the Bankruptcy Court determined in the Valuation Order that the value of the Marsh Hawk Assets was $10,500.000, no other Creditors of Marsh Hawk would likely receive any funds. Therefore, the Plan Proponents believe that dismissal of the Chapter 11 Bankruptcy Cases is not a viable alternative to the Plan.

# ARTICLE XIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE FOLLOWING IS NOT INTENDED TO BE A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN FOR HOLDERS OF CLAIMS AND INTERESTS ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR AN INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN INDIVIDUAL TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX**

## CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER.

A holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on the Claim but was not previously included in income by the holder of the Allowed Claim. A holder of an Allowed Claim or Allowed Equity Interest will generally recognize gain or loss equal to the difference between the holder's adjusted basis in the Claim or the Equity Interest and the amount realized by the holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the holder, the nature of the Claim or Equity Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to the Claim, and the holder's holding period for the Claim or Equity Interest. If the Claim or Equity Interest possessed by the holder is a capital asset, the gain or loss realized will be generally characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the holder is a non-corporate taxpayer and held such Claim or Equity Interest for longer than one year or short-term capital gain or loss if the holder held such Claim or Equity Interest for less than one year. Holders should consult with their own tax advisors as to the tax character of any gain or loss with respect to amounts received under the Plan and the application of any special limitations on the deduction of any loss that is realized.

A holder of an Allowed Claim or Allowed Equity Interest who receives, in respect of its Claim or Equity Interest, an amount that is less than its tax basis in such Claim or Interest may be entitled to a bad debt deduction or a worthless securities deduction. However, whether a holder of Claims or Equity Interests will recognize a bad debt deduction, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims or Equity Interests. Accordingly, holders of Claims and Equity Interests should consult their own tax advisors.

The Plan Trustee will withhold distributions provided under the Plan and required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code. Under the Tax Code, interest, dividends, and other "reportable payments" may under certain circumstances be subject to "backup withholding." Backup withholding generally applies if the holder (i) fails to furnish his social security number or other taxpayer identification number ("**TIN**"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the holder is not subject to backup withholding. Your Ballot contains a place to indicate your TIN.

## ARTICLE XIV. CONCLUSION AND RECOMMENDATION

The Proponents believe that confirmation of the Plan is preferable to any of the alternatives discussed herein because it will provide the greatest recovery to Creditors. Other

alternatives would include significant delay, uncertainty, and substantial administrative costs and are likely to reduce any return to Creditors. The Proponents urge holders of Impaired Claims in Classes 1, 2, and 3 of the Ford's Colony Plan who are entitled to vote on such Plan to vote to accept the Plan and to evidence such acceptances by returning their Ballots to Prudential so that they will be received not later than 5:00 p.m. (prevailing Eastern Time) on April __, 2011.

Submitted this __ day of March, 2011:

| /s/ Christian K. Vogel | /s/ John D. McIntyre |
|---|---|
| Counsel | Counsel |
| | |
| LeClair Ryan | Wilson & McIntyre, PLLC. |
| Bruce H. Matson (Va. Bar No. 22874) | John D. McIntyre (Va. Bar No. 35925) |
| Christian K. Vogel (Va. Bar No. 75537) | 500 E. Main Street |
| Riverfront Plaza, East Tower | Suite 920 |
| 951 East Byrd Street, Eighth Floor | Norfolk, Virginia 23510-3889 |
| Richmond, Virginia 23219 | P: (757) 961-3900 |
| (804) 916 7198 Direct | F: (757) 961-3966 |
| Christian.Vogel@leclairryan.com | jmcintyre@wmlawgroup.com |

*Attorneys for the Official Committee of Unsecured Creditors*

Alston & Bird, LLP
Grant T. Stein (*pro hac vice*)
Jonathan T. Edwards
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
grant.stein@alston.com
jonathan.edwards@alston.com

*Attorneys for Prudential Industrial Properties, LLC*